IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RANDY HOWARD, Individually and on Behalf
of All Others Similarly Situated,

    Plaintiff,

v.                                      Case No. 2:10-cv-2555-JTM

FERRELLGAS PARTNERS, L.P.;
FERRELLGAS, L.P.; FERRELLGAS, INC.;
and DOES 1 through 25,

    Defendants.

## MEMORANDUM AND ORDER

Plaintiff Randy Howard ("Plaintiff"), on behalf of himself and all others similarly situated, seeks damages against Defendants Ferrellgas Partners, L.P., Ferrellgas, L.P., and Ferrellgas, Inc. (collectively "Defendant")[1] for allegedly engaging in unfair, unconscionable, deceptive, misleading, and unlawful conduct in connection with the marketing and sale of propane and related equipment and services. This matter is before the court on Plaintiff's Motion for Leave to Submit an Expert Report (Dkt. 89). To the extent outlined below, Plaintiff's motion is granted.

### I.    Factual and Procedural Background

Plaintiff alleges that, in August 2008, he "decided to order propane and lease a propane tank from Ferrellgas because Ferrellgas advertised low prices" to service his residence in Yucca Valley, California. Dkt. 1, ¶ 23. Plaintiff therefore reached out to Defendant on August 21,

---

[1] Plaintiff alleges that the defendants operated as a single enterprise as it relates to his Complaint. Dkt. 1, ¶ 13. As such, the defendants will be referred to in the singular form.

2008. Plaintiff alleges that, on that date, the parties entered into an agreement (the "oral contract") for both the initial delivery and fill of a propane tank as well as all subsequent fills of the tank. According to Plaintiff, Defendant "stated that the first fill would occur at an introductory rate and that subsequently the price of propane would be billed at market price." Dkt. 1, ¶ 23. On August 27, 2008, Defendant installed a 250-gallon propane tank on Plaintiff's property and filled it with fifty (50) gallons of propane. Dkt. 1, ¶ 26. Defendant delivered an additional 167.70 gallons of propane on September 5, 2008. Dkt. 1, ¶ 26.[2] Defendant billed Plaintiff for the initial fill at the introductory rate on September 9, 2008. Dkt. 1, ¶ 28. Plaintiff paid this bill on September 19, 2008. Dkt. 38-8, at 4.

On December 3, 2008, Defendant delivered 57.80 gallons of propane to Plaintiff. Dkt. 38-8, at 4. On December 7, 2008, Defendant issued a bill for this fill in the amount of $278.17, making the price of propane $4.71 per gallon. Plaintiff disputed this charge, alleging that the national average price for home delivery of consumer-grade propane was $2.37 per gallon. Dkt. 1, ¶ 30. Defendant agreed to modify the price to $2.85 per gallon and re-billed Plaintiff on December 21, 2008. Dkt. 38-8, at 5. Plaintiff paid this invoice on December 29, 2008. Dkt. 38-8, at 6.

On January 27, 2009, Defendant delivered 79.90 gallons of propane to Plaintiff, at a price of $4.92 per gallon. Dkt. 38-8, at 7. Plaintiff again disputed this rate and Defendant modified the price to $2.95 per gallon. Dkt. 38-8, at 8. Plaintiff paid this bill on February 17, 2009. Dkt. 38-8, at 9. On March 12, 2009, Defendant delivered 53.20 gallons of propane to Plaintiff at a price of $2.82 per gallon. Dkt. 38-8, at 10. Plaintiff paid this bill without complaint on March 27, 2009. Dkt. 38-8, at 11. Plaintiff received another 28.40 gallons of propane on May 20, 2009,

---

[2] These first two propane deliveries are both considered to be part of the "initial fill."

priced at $2.82 per gallon, which he also paid for without complaint on June 19, 2009. Dkt. 38-8, at 11-12.  On August 25, 2009, Defendant charged Plaintiff a $65 annual tank rental fee, which Plaintiff paid on September 10, 2009.  Dkt. 38-8, at 12-13.  Defendant made another delivery of 47.30 gallons on October 14, 2009, at a price of $3.22 per gallon.  Dkt. 38-8, at 13.  Plaintiff disputed this rate, which Defendant ultimately lowered to $2.25 per gallon.  Dkt. 38-8, at 14.  Defendant made two more deliveries, one on December 17, 2009, of 76.80 gallons, and one on January 22, 2010, of 67.00 gallons.  Dkt. 38-8, at 15-16.  Plaintiff paid both invoices without complaint.  Dkt. 38-8, at 16-17.

Plaintiff alleges that Defendant did not provide him any written agreement until he specifically requested one. Dkt. 1, ¶ 33.  In his Complaint, Plaintiff alleged that he requested and received a copy of Defendant's terms, entitled "Master Agreement for Propane Sales and Equipment Rental" ("Master Agreement") in February 2010. Dkt. 1, ¶ 34.  However, Defendant claims that it sent Plaintiff a confirmation letter, with the Master Agreement attached, on September 24, 2008.  Dkts. 38-6, 38-7.  In his deposition, Plaintiff stated that while it was possible that he received this confirmation letter and Master Agreement in 2008, he does not actually remember receiving it.  Dkt. 60-2, at 24-25, 28-29, 35-36.

In addition to basic provisions governing the relationship between the parties, the Master Agreement also contained dispute-resolution clauses that required the parties to settle any dispute through arbitration:

> You agree that any claim, dispute or controversy, whether in contract, tort (intentional or otherwise) including without limitation, product liability, property damage, personal injury claims or claims based on strict liability, whether pre-existing, present or future, and including constitutional, statutory, common law, regulatory and equitable claims in any way relating to (a) the Service; (b) any Rented Equipment or equipment sold to you by us; (c) the Agreement; (d) Propane delivered or sold by us; or (e) the Safety Plan, advertisements, promotions or other brochures or writings prepared by us in any way relating to

3

> the Service or this Agreement and/or the relationship between you and us, including the validity, enforceability or scope of this Section or any part thereof (collectively, a "Claim") shall be resolved, upon the election of either you or us, by binding arbitration.
>
> You acknowledge that you have a right to litigate claims in court before a judge or jury, but you prefer to resolve any such claims through arbitration and knowingly and voluntarily waive your rights to litigate such claims in court before a judge or jury, upon election of arbitration by you or by us. You will not have the right to participate as a representative or member of any class of claimants pertaining to any claim subject to arbitration, even if such class action is pending on the effective date of this arbitration provision, except that this arbitration provision will not preclude your participation in a class which has already been certified on the effective date of this arbitration provision. This Section 8 applies only to the extent permitted under your state law.

Dkt. 38-7, at 18, 19-20.

The Master Agreement did not require Plaintiff's signature; rather, it set forth three alternative means by which Plaintiff would be deemed as having accepted its terms: (1) request or accept delivery of propane, service, or equipment from Defendant; (2) pay for delivery of propane, service, or equipment from Defendant; or (3) permit propane or equipment from Defendant to remain on Plaintiff's property for more than thirty (30) days after Plaintiff's receipt of the Master Agreement. Dkt. 38-7, at 3.

Defendant contends that Plaintiff accepted the Master Agreement by: (1) accepting delivery of propane, (2) paying for delivered propane, and (3) allowing the propane tank to remain on his property for more than thirty days after his receipt of the Agreement. While Plaintiff admits these facts, he disputes that this behavior constituted acceptance of the Master Agreement. Rather, Plaintiff argues that the oral contract governed the dealings between the parties and the Master Agreement was merely an offer to modify the terms of the oral contract, which Plaintiff argues he never accepted. Plaintiff also denies that the oral contract was conditional upon acceptance of the Master Agreement. Dkt. 42, at 5. In response, Defendant

4

argues that the oral contract only applied to the initial fill and that subsequent deliveries were "predicated on [Plaintiff's] agreement to [the Master Agreement's] terms and conditions." Dkt. 43, at 6.

On October 13, 2010, Plaintiff filed a Class Action Complaint against Defendant seeking monetary damages for alleged breach of contract, breach of implied covenant of good faith and fair dealing, violation of the Kansas Consumer Protection Act, promissory estoppel, and unjust enrichment (Dkt. 1). On September 6, 2011, Defendant filed a motion to compel Plaintiff to submit to arbitration, pursuant to the terms of the Master Agreement (Dkt. 37). Plaintiff opposed the motion, arguing that the parties were governed by the oral contract, which lacked any provision concerning arbitration. In an order dated August 27, 2012, this court found that the parties did indeed enter into an oral contract in August 2008. Dkt. 45, at 7. However, based on the conflicting evidence, the court was unable to determine the *scope* of that contract, noting:

> The scope of the oral agreement is material as to whether or not [Plaintiff] accepted the Master Agreement. If the oral agreement established continuous propane service, then the Master Agreement might have been an offer to modify the existing oral contract . . . [Defendant] argues there were two agreements, an oral agreement which ended after the initial fill, and the Master Agreement which applied to all subsequent service. If any oral agreement covered only the initial installation and fill, the Master Agreement might govern the long-term relationship between the parties and the arbitration clause would apply.

Dkt. 45, at 7. The court therefore denied Defendant's motion to compel arbitration and ordered the parties to take limited discovery as to the scope of the oral contract and Master Agreement. Dkt. 45, at 8.[3]

On September 10, 2012, in anticipation of an appeal, Defendant filed a motion for reconsideration requesting that the court change the word "denied" to "deferred" (Dkt. 48). The

---

[3] In its order, the court also discussed choice of law matters. The court ultimately concluded that more information was needed about the circumstances surrounding the oral contract before deciding the issue. Dkt. 45, at 5-6. As such, the court will apply basic Kansas contract principles while deciding preliminary issues. Dkt. 45, at 6.

5

court granted this request (Dkt. 62). The parties thereafter commenced limited discovery. On February 15, 2013, after reviewing this discovery, the court issued a second order denying Defendant's motion to compel, finding

> . . . the situation to be as it was before. The parties agree there was an oral agreement, but there is still a genuine dispute as to its scope. A reasonable trier of fact could find that the scope of the oral agreement extended to future propane fills. This finding would foreclose application of the Master Agreement and its arbitration clause to these claims. As a result, a genuine dispute remains regarding the parties' agreement to arbitrate.

Dkt. 65, at 8.

On March 7, 2013, Defendant filed a Notice of Appeal (Dkt. 66). On April 8, 2014, the Tenth Circuit vacated the judgment of this court and remanded the case for further proceedings, holding that this court erred by ordering additional discovery on the question of whether the parties were bound to arbitration instead of proceeding summarily to a trial of the relevant facts, as directed by the Federal Arbitration Act ("FAA"). *Howard v. Ferrellgas, et. al.*, 748 F.3d 975 (10th Cir. 2014).

In reaching its conclusion, the appellate court discussed at length the murkiness surrounding the initial oral contract and the effect that Defendant's Master Agreement had, if any, on that oral contract. Although not initially presented to this court, Defendant argued, on appeal, that even if the parties were bound by the oral contract beyond the initial fill, the arbitration clause would still apply because of the "rolling theory of contract formation." Under this theory, the courts should honor the Master Agreement, "treating its introduction of written terms as a step in the formation of the original contract itself, not as an amendment to an agreement fully formed by the end of that first phone call." *Id*. at 982. The appellate court expressed two concerns about this approach. First, it noted that the rolling formation theory

6

"may be about as controversial an idea as exists today in the staid world of contract law." *Id*. Second, the theory has been rejected by Kansas courts. *Id*.

In an attempt to get around this second problem, Defendant argued that Kansas law should not even apply to this case. Rather, since the last act necessary to form the initial oral contract took place in California (where Plaintiff was located), it is California law that should govern. Conveniently, Defendant pointed out, California is among those handful of states that seems to accept the rolling contract theory. Alternatively, Defendant argued that if California law does not apply, then it is Washington law that must govern, since Washington is where Defendant's customer service representative was located. Washington also seems to accept the rolling theory of contract formation. The Tenth Circuit declined to rule both on the choice of law argument and the enforceability of the arbitration clause, instead remanding the case to this court for trial to resolve the underlying questions of fact, which it summarized as follows:

> We know [Plaintiff] called [Defendant] to order propane to heat his home. We know [Defendant] agreed to sell him some. But much more than that remains unclear even now. Did the parties form a final and complete oral contract in that initial phone call governing *all* their propane dealings over the next few years? Or did their agreement cover *only* [Plaintiff's] propane tank rental and its initial fill, in this way perhaps leaving room for [Defendant's] later-delivered, arbitration-clause-containing form contract to govern the parties' subsequent dealings, including the later propane purchases at issue in this case?
>
> Whether this case belongs in arbitration or litigation hinges on the answers to factual questions like these. It is possible that the parties reached an agreement requiring [Defendant] to refill [Plaintiff's] propane tank at market prices whenever it verged on empty, without a single mention of [Defendant's] forthcoming written terms. If that's the case, then under Kansas law (which the district court applied here) [Defendant's] arbitration clause could modify the parties' preexisting oral agreement only with [Plaintiff's] express consent, something he contends he never gave. But it also remains possible that the parties agreed only to an initial fill during that phone call. And if *that's* the case, then under Kansas law [Defendant's] arbitration clause and other written terms may well govern the parties' later dealings because they amounted to an offer to provide future service that [Plaintiff] accepted when he chose to keep the propane [Defendant] went on to deliver.

*Id*. at 979.

Trial in this matter was initially set for June 10, 2014. On May 20, 2014, the parties consented to a continuance, rescheduling the matter for September 16, 2014. In preparation for trial, on August 12, 2014, Plaintiff filed a Motion for Leave to Submit an Expert Report, pursuant to Federal Rule of Civil Procedure 26(A)(2) (Dkt. 90), which is now before this court. Plaintiff seeks to admit the expert report of Dr. John Murray ("Dr. Murray"), a purported expert on contract law with specific knowledge of the rolling contract formation theory. Defendant opposes the motion and argues that the report contains inadmissible evidence and is untimely (Dkt. 93).

## II.     Legal Standard

The admissibility of expert testimony is generally governed by Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) the testimony is based on sufficient facts or data;
>
> c) the testimony is the product of reliable principles and methods; and
>
> d) the expert has reliably applied the principles and methods to the facts of the case

FED. R. EVID. 702. This rule requires a court to act as a gatekeeper to ensure that expert testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) (discussing evidence and reliability); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (extending gatekeeping role to all expert testimony).

Rule 702 works in conjunction with Rule 704, which provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." However, "testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored." *Anderson v. Suiters*, 449 F.3d 1228, 1237 (10th Cir. 2007); *see also Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc). An expert may not "state legal conclusions drawn by applying the law to the facts." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003). "Expert legal testimony is not permitted." *Boardwalk Apts., L.C. v. State Auto Prop. & Cas. Ins. Co.*, 2014 U.S. Dist. LEXIS 41902, *10 (D. Kan. Mar. 28, 2014) (citing *Specht*, 853 F.2d at 810). An attorney expert may "refer to the law in expressing his opinion, but he may not tell the jury what legal standards must guide their verdict." *MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp.*, 468 F. App'x 816, 821 (10th Cir. 2012).

Pursuant to Federal Rule of Civil Procedure 26, a party must disclose to all other parties the identity of any witness it may use at trial. FED. R. CIV. P. 26(a)(2)(A). Such disclosures must be made "at least 90 days before the date for trial or for the case to be ready for trial." FED. R. CIV. P. 26(a)(2)(D)(i). In the event a party fails to meet this deadline, he is "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)). "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Id*. (citing *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998)).

9

### III.     Legal Analysis

Plaintiff seeks to admit the expert report of Dr. Murray, Professor of Law and Chancellor of Duquesne University and an alleged expert on contract law.[4]  In his report, Dr. Murray discusses: (1) the distinction between invitations to treat and offers in consumer contracts, (2) the Uniform Commercial Code ("UCC") price terms and the nature of long-term supply contracts, (3) the modification of oral contracts by acceptance of goods, and (4) the applicability of the Statute of Frauds.  Within this report, Dr. Murray also discusses the rolling theory of contract formation.  Defendant opposes the introduction of Dr. Murray's report on the grounds of untimeliness and inadmissibility.

**A.    Timeliness of Motion**

Defendant first argues that Plaintiff's motion is untimely.  Trial in this matter was originally set for June 10, 2014.  On May 20, 2014, the parties, through a joint motion, consented to continuing the matter until September 16, 2014.  Plaintiff filed the current motion for leave on August 12, 2014, just over a month before trial.  As noted above, witness disclosures must be made at least ninety (90) days before trial.  FED. R. CIV. P. 26(a)(2)(D)(i).  Therefore, under the trial schedule as it existed at the time of the motion, Plaintiff was required to show that his untimely submission was either substantially justified or harmless.  FED. R. CIV. P. 37(c)(1).

However, on August 25, 2014, the court notified the parties of its need for a second continuance.  Trial was therefore moved to November 12-13, 2014.  Since Plaintiff's motion was

---

[4] In his report, Dr. Murray states that he has a lengthy history teaching contracts and commercial law in three law schools and related courses and seminars.  His scholarship includes classroom books, texts, and treatises on contract and commercial law as well as numerous law review articles.  He is the author of the text *Murray on Contracts* and the casebook by the same name, each in their fifth and sixth edition, respectively.  Dr. Murray serves as the author of the biannual supplements to *Corbin on Contracts* and he is the authority of *Corbin on Contracts Desk Edition*.  He is also the co-author of Murray and Flechtner's *Sales, Leases and Electronic Contract in National and International Transactions*, currently in its fourth edition.  Dkt. 90-1, at 1.

10

filed on August 12, 2014, it does, in fact, satisfy the ninety-day requirement. As such, the court finds any conflict over the timeliness of Plaintiff's submission to be moot.

**B.     Admissibility of Report**

Defendant next argues that Dr. Murray's report is inadmissible because it provides legal opinions. More specifically, Defendant claims that the report is inadmissible because it: (1) relies on facts that are contrary to the evidence, (2) offers argument rather than analysis, (3) opines on Plaintiff's state of mind, and (4) declares the law as Dr. Murray thinks it should be. Dkt. 93, at 4. In Defendant's words, Dr. Murray's report is an "unabashed attempt to displace the Court as law and fact finder." Dkt. 93, at 4.

While Defendant is correct that an expert witness is generally prohibited from providing legal opinions, "courts are more concerned about an expert who presents legal conclusions to a jury rather than to a judge." *Raytheon Aircraft Co. v. United States*, 2008 U.S. Dist. LEXIS 17201, at *37 (D. Kan. Mar. 4, 2008) (internal citations omitted). Indeed, "the Tenth Circuit has suggested that a district court conducting a bench trial may, in drawing its own conclusions, consider the legal conclusions of an expert." *Id.* at *38 (citing *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1493 (10th Cir. 1993)). Here, because there is no jury to instruct, the danger of allowing Dr. Murray to "stray out of bounds and into the rightful territory of the Court" is greatly diminished. *Id.*

That having been said, however, Defendant is also correct that certain portions of Dr. Murray's report read like a legal opinion. For example, Dr. Murray makes numerous conclusions about the formation and scope of the oral contract:

> These facts clearly demonstrate the formation of a contract.
>
> The defendant, however, then suggests that there was a contract only for the "initial fill." If the fill was "initial," presumably it was the first of several fills

11

> contemplated by the parties. But, says the defendant, it never agreed to a long-term contract with [Plaintiff]. If that is the case, why was there a two-year rental of the defendant's tank which it quite willingly installed on [Plaintiff's] [sic] property? Did [Plaintiff] agree to rent the tank for two years only to hold a supply of propane that would not last more than a few months?
>
> The defendant's suggested interpretation of the facts violates every canon of interpretation in contract law . . . On the undisputed facts, the reasonable interpretation is that [Plaintiff] required propane and called [Defendant]. He ordered the propane during that telephone conversation. He says he was told that the initial filling would be at a discount price and subsequent deliveries would be at market price. [Defendant's] own subsequent billing corroborates the discount for the initial fill. [Plaintiff] agreed to lease the tank for two years. Reasonable parties do not enter into contracts for the supply of gas, electricity or propane for two months. *All* of the evidence points to a simple consumer contract for the supply on an essential energy source for his home: there was a clear manifestation of offer and acceptance forming a contract in the telephone conversation.
>
> While the evidence is clear that there was a telephone contract precisely conforming to [Plaintiff's] claim, the last scintilla of doubt is erased by the defendant's delivery of equipment and goods to [Plaintiff]. There was never any question in [Plaintiff's] mind concerning the formation of a contract. [Defendant] also acquiesced in the fact that a contract existed.

Dkt. 90-1, at 2-3 (emphasis in original). Indeed, by way of summary, Dr. Murray concludes:

> It is abundantly clear that the parties formed an oral contract by telephone which they performed through the delivery, receipt and acceptance of propane. That performance meets statute of frauds requirements. There is no enforceable agreement containing [Defendant's] arbitration terms. [Plaintiff] never agreed to arbitration and is not subject to it . . . .

Dkt. 90-1, at 9.[5]

The entire purpose of Dr. Murray's report, Plaintiff argues, is to "assist this Court in addressing the complexities of rolling contract formation and terms-later contracting." Dkt. 90, at 3. However, in doing this, Dr. Murray unquestioningly concludes that the parties entered into

---

[5] Defendant also argues that one of Dr. Murray's conclusions, that "there was a duration term in this contract of two years made by telephone under which [Plaintiff] agreed to purchase its [sic] propane exclusively from [Defendant] for two years at market prices (after the "initial fill")," is contrary to the facts in evidence, namely, Plaintiff's own deposition. Dkt. 93, at 4-5. While this may or may not be true, it is irrelevant to the task at hand. Whether Plaintiff agreed to *exclusively* purchase propane from Defendant is not currently in issue.

the oral contract exactly as Plaintiff alleges and proceeds to conclusively set forth the scope of that oral contract. Dr. Murray did not, for example, make hypothetical conclusions such as "in the event the court determines that the parties had an oral contract that governed their relationship beyond the initial fill then Defendant's rolling contract theory would come into play as follows." Nor did he set up an entirely hypothetical situation, such as "if party A and party B enter into an oral contract and party B subsequently submits to party A a written agreement that party B claims now governs the relationship, party B may seek to use the rolling contract theory as follows." Instead, Dr. Murray directly applied the specific facts of this case to the law and made a conclusion on the ultimate issue of fact.

There is no doubt that the point of this trial is to determine whether the parties are bound by the arbitration provision. To do that, the *court* must determine whether the parties entered into an oral contract that encompassed both the initial fill and all subsequent fills or if the oral contract simply governed the initial fill. In the first situation, the Written Agreement could be seen as a modification, which requires express acceptance by Plaintiff without which the arbitration provision does not apply. In the latter situation, subsequent fills would be governed by the Written Agreement and the parties may be bound to the arbitration provision by Plaintiff's acceptance of these subsequent fills. But this, as well as the parties' state of mind in entering or not entering into one or both of these agreements, are issues for the *court*, not Plaintiff's, or, for that matter, Defendant's expert to decide.

Defendant also argues that Dr. Murray's report contains "numerous legal opinions . . . based on what he thinks the law should be, not the law as it exists in any implicated state." Dkt. 93, at 5. In response, Plaintiff argues that the report incorporates one of Dr. Murray's own articles which includes reference to relevant cases, including Kansas and Washington, both of

which may provide the applicable law in future proceedings.  Dkt. 94, at 4.  While this is true, Plaintiff neglects to mention that the applicable law may also be that of California, which is not included in Dr. Murray's article.  *See generally* John E. Murray, Jr., *The Dubious Status of the Rolling Contract Formation Theory*, 50 Duq. L. Rev. 35 (2012).  However, the primary purpose of Dr. Murray's report seems to be to provide the court with a general understanding of the concept of rolling contract theory and how it would work in conjunction with the UCC.  Dr. Murray does this, albeit somewhat minimally, on pages five and six of his report.  Dkt. 90-1, at 5-6.

Although the danger of the effect of Dr. Murray's opinions and conclusions is significantly diminished in the absence of a jury, the court cannot simply ignore basic rules of evidence.  Therefore, the court will not consider the legal opinions and conclusions contained in Dr. Murray's report.  Nor will it permit Dr. Murray to testify, in the event that Defendant seeks to depose him, to the governing legal standard or whether the parties' actions and behavior satisfy that standard.  The court will, however, permit Dr. Murray, should Defendant choose to depose him, to opine as to what certain actions in contractual relationships mean through the form of responses to hypothetical questions.  This, of course, is in addition to the general explanatory provisions of Dr. Murray's report, especially with regard to rolling contract theory, and any testimony that Dr. Murray may offer generally on contracts, contractual relationships, and rolling contract theory.

**IT IS THEREFORE ORDERED** this 16th day of September, 2014, that Plaintiff's Motion for Leave to Submit an Expert Report is granted to the extent outlined above.

s/J. Thomas Marten<br>J. THOMAS MARTEN,<br>CHIEF JUDGE