IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


RANDY HOWARD, Individually and on Behalf
of All Others Similarly Situated,

      Plaintiff,

v.                                                                    Case No. 2:10-CV-2555-JTM

FERRELLGAS PARTNERS, L.P.;
FERRELLGAS, L.P.; FERRELLGAS, INC.;
and DOES 1 through 25,

      Defendants.


**ORDER**

Plaintiff Randy Howard, on behalf of himself and all others similarly situated, seeks damages against defendants Ferrellgas Partners, L.P.; Ferrellgas, L.P.; and Ferrellgas, Inc. (collectively "defendant") for allegedly engaging in unfair, unconscionable, deceptive, misleading, and unlawful conduct in connection with the marketing and sale of propane and related equipment and services.  Pursuant to the Federal Arbitration Act ("FAA"), and at the direction of the Tenth Circuit, on November 12, 2014, this court conducted a summary trial to determine one basic, preliminary question: are the parties bound by an arbitration agreement, and therefore required to arbitrate, not litigate, the above-listed claims?  Based on the evidence presented at trial and the applicable law, the court answers this question in the affirmative, as described below.

## I.      Facts and Procedural History

The parties' story is nothing new: customer needs a good, customer locates a supplier of said good, customer offers to buy the good from the supplier, and the supplier agrees to sell consumer the good.  In fact, the parties agree that this is exactly what happened.  Plaintiff, a resident of California, needed propane for his residential use.  Dkt. 114, at 1-2.  Having never been a consumer of residential propane before, plaintiff shopped around and ultimately decided on service from defendant, a nationwide provider of propane, propane services, and equipment. Dkt. 115, at 3.[1]  On August 21, 2008, plaintiff called defendant and reached one of its representatives, Adrienne Williams, in Vancouver, Washington.  Dkt. 114, at 2; Dkt. 115, at 3. The agreed-upon facts of the content of this telephone call are as simple as those generic ones stated above: plaintiff needed propane, plaintiff determined that defendant was a supplier of propane, plaintiff requested propane from defendant, and defendant agreed to sell plaintiff propane.  Dkt. 114, at 2; Dkt. 115, at 4.  The contents of this August 2008 telephone call shall hereinafter be referred to as the "Oral Contract."  On September 5, 2008, defendant installed a 250-gallon propane tank on plaintiff's property and filled it with 217.60 gallons of propane, for which it charged plaintiff an introductory rate of $2.11 per gallon.  Dkt. 115, at 4.  This September 5, 2008, fill of propane shall hereinafter be referred to as the "First Fill."

This, however, is where the simplicity ends.  What appears, at least on the surface, to be a simple consumer transaction, is currently embroiled in a game of "he said, they said" that has now spanned nearly five years.  At the heart of this quagmire, at least for this court's purposes, is

---

[1] Defendant Ferrellgas Partners, L.P. is a Delaware limited partnership located in Overland Park, Kansas, and is the sole limited partner of Ferrellgas, L.P.  Defendant Ferrellgas, L.P. is a Delaware limited partnership located in Overland Park, Kansas, and is the operating partnership of Ferrellgas Partners, L.P.  Defendant Ferrellgas, Inc. is located in Liberty, Missouri, and operates as a subsidiary and the general partner of Ferrellgas Partners, L.P. Dkt. 114, at 1-2.

one significant question: does this case even belong in litigation?  The parties clearly disagree as to the answer to this crucial question, as set forth below.

## A.      Plaintiff's Allegations

According to plaintiff, on that fateful day in August 2008, he entered into an oral contract with defendant *not only* for the tank rental and the First Fill, but also for all *subsequent* fills of propane thereafter.  Plaintiff claims that he became a "keep full" customer, meaning that defendant promised to monitor the propane level in his tank from afar and refill as necessary, without any further request from plaintiff.  Dkt. 114, at 2.  Plaintiff alleges that he was not bound by any terms and conditions and never saw, let alone signed, any written document memorializing his relationship with defendant.  Plaintiff claims that defendant's representative told him that, after the First Fill, which was assessed at a special introductory per-gallon rate, plaintiff would be charged at propane's current "market price."

## B.      Defendant's Allegations

Defendant's version of events is decidedly different.  While it admits that there was, in fact, an Oral Contract, defendant argues that this Oral Contract governed *only* plaintiff's tank set and First Fill.  The rest of plaintiff's propane fills were governed by a written Master Agreement, a document that contained, generally, defendant's terms and conditions of the consumer relationship and, more relevantly, arbitration and integration clauses.  Defendant alleges that it mailed this Master Agreement to plaintiff on September 26, 2008, in conjunction with an entire Customer Packet that also contained a service letter describing the services and products plaintiff had purchased and the Ferrellgas Safety Plan, which set forth the mandated requirements and procedures for inspection and maintenance of propane and propane equipment.  Dkt. 115, at 4-5. Plaintiff denies receiving this packet in September 2008.

3

C.      **The Master Agreement**

This brings the court to the current issue of whether plaintiff's substantive claims must, in fact, be arbitrated, pursuant to the terms and conditions of the Master Agreement.  The relevant portions of the Master Agreement read as follows:

> **PLEASE READ THIS MASTER AGREEMENT FOR PROPANE SALES AND EQUIPMENT RENTAL (this "Agreement") CAREFULLY.   The terms and conditions of this Master Agreement will be accepted by you when one of the following occurs: (1) you request or accept delivery of propane, service or equipment from us; (2) you pay for delivery of propane, service or equipment from us; or (3) you permit Propane or equipment obtained from us to remain on your property for more than thirty (30) days after your receipt of this Agreement.  If you do not wish to be bound by this Agreement, please contact Ferrellgas within thirty (30) days after your receipt of this Agreement and terminate service.  The terms of this Agreement also will apply to sales of refined fuel products.**
>
> **8. Arbitration**
>
> **a.      Agreement to Arbitrate**.  You agree that any claim, dispute or controversy, whether in contract, tort (intentional or otherwise), including without limitation, product liability, property damage, personal injury claims or claims based on strict liability, whether pre-existing, present or future, and including constitutional, statutory, common law, regulatory and equitable claims in any way relating to (a) the Service; (b) and Rented Equipment or equipment sold to you by us; (c) the Agreement; (d) Propane delivered or sold by us; or (e) the Safety Plan, advertisements, promotions or other brochures or writings prepared by us in any way relating to the Service or this Agreement and/or the relationship between you and us, including the validity, enforceability or scope of this Section or any part thereof (collectively, a "Claim") shall be resolved, upon the election of either you or us, by binding arbitration.
>
> **e.      General Statements**. . . . **YOU ACKNOWLEDGE THAT YOU HAVE A RIGHT TO LITIGATE CLAIMS IN COURT BEFORE A JUDGE OR JURY, BUT YOU PREFER TO RESOLVE ANY SUCH CLAIMS THROUGH ARBITRATION AND KNOWINGLY AND VOLUNTARILY WAIVE YOUR RIGHTS TO LITIGATE SUCH CLAIMS IN COURT BEFORE A JUDGE OR A JURY, UPON ELECTION OF ARBITRATION BY YOU OR BY US.   YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION, EVEN IF SUCH CLASS ACTION IS PENDING ON THE EFFECTIVE DATE OF THIS ARBITRATION PROVISION, EXCEPT**

**THAT THIS ARBITRATION PROVISION WILL NOT PRECLUDE YOUR PARTICIPATION IN A CLASS WHICH HAS ALREADY BEEN CERTIFIED ON THE EFFECTIVE DATE OF THIS ARBITRATION PROVISION.  THIS SECTION 8 APPLIES ONLY TO THE EXTENT PERMITTED UNDER YOUR STATE LAW.**

Trial Ex. 3, at 2, 8, 18.  It also contained an integration clause:

**13.    Miscellaneous.**

**c.    Entire Agreement.** This Agreement, together with the Service Letter and Safety Plan and any written agreements signed between us that are limited to pricing and cover the current period, constitute the entire agreement between us. No employee, representative or agent has any authority to vary the terms of this Agreement.

Trial Ex. 3, at 18-21 (emphasis in original).[2]

Over the course of two years, plaintiff received and accepted ten deliveries of propane from defendant:

| Date | Quantity | Price Charged | Price Paid |
|------|----------|---------------|------------|
| August 27, 2008 | 50 | $2.11 | $2.11 |
| September 5, 2008 | 167.6 | $2.11 | $2.11 |
| December 3, 2008 | 57.8 | $4.71 | $2.85 |
| January 27, 2009 | 79.9 | $4.92 | $2.95 |
| March 12, 2009 | 53.2 | $2.82 | $2.82 |
| May 20, 2009 | 28.4 | $2.82 | $2.82 |
| October 14, 2009 | 473 | $3.22 | $2.25 |
| December 17, 2009 | 76.8 | $2.50 | $2.50 |
| January 22, 2010 | 67 | $2.64 | $2.64 |
| March 9, 2010 | 74.6 | $2.38 | $2.38 |

Trial Ex. 34.  On three occasions, December 3, 2008; January 27, 2009; and October 14, 2009; plaintiff called defendant to complain that the "price charged" for propane was well above the

---

[2] In conjunction with the Safety Plan, the Master Agreement also describes and mandates provisions that propane customers might expect to see in connection with the sale of propane, namely: requirements that the customer read, understand, and comply with the Safety Plan; limitations on a customer's use of the rented equipment as well as the movement of such; and obligations on the part of the consumer to regularly inspect and monitor the equipment, provide defendant appropriate access to the equipment, comply with all laws and industry standards concerning the use and storage of propane, and to indemnify defendant in certain circumstances.  Dkt. 115, at 6.

market price.  Dkt 115, at 7.  In response to plaintiff's complaints, defendant lowered the price charged.  Plaintiff terminated service with defendant in September 2010 when he sold his house. Dkt. 115, at 7.

On October 13, 2010, plaintiff filed this putative class action lawsuit against defendant alleging breach of an oral contract to supply propane at a "market price," breach of an implied covenant of good faith and fair dealing, violations of the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.* ("KCPA"), as well as claims for promissory estoppel and unjust enrichment.  Dkt. 1.  Defendant moved to dismiss the Complaint on December 10, 2010. Dkt. 23. On August 1, 2011, the court sustained defendant's motion with respect to plaintiff's KCPA, promissory estoppel, and unjust enrichment claims, leaving only his claims for breach of an oral contract and breach of the implied covenant of good faith and fair dealing.  Dkt. 32.

On September 6, 2011, defendant moved to compel arbitration of the remaining claims, alleging that plaintiff's dispute arose out of propane deliveries and charges that occurred after plaintiff allegedly received and consented to the Master Agreement.  Dkt. 37.  Plaintiff opposed defendant's motion to compel, arguing that he and defendant entered into a long-term oral contract for the supply of propane at market price during the August 21, 2008, telephone call. Dkt. 42.  On August 27, 2012, the court deferred a final ruling on defendant's motion, determining that it did not have sufficient evidence of the scope of the alleged oral contract to sustain the motion.  Dkt. 45.  Specifically, the court found that there were still disputed facts concerning *which* agreement applied to the long-term relationship between the parties, the Oral Contract or the Master Agreement.  Dkt. 45, at 7-8.  The court therefore ordered the parties to conduct limited discovery and to file supplemental briefs regarding two issues: (1) the applicable choice of law, and (2) the scope of the purported Oral Contract.  Dkt. 45, at 9.

Following discovery, the court found "the situation to be as it was before," with a genuine dispute as to the scope of the Oral Contract. Dkt. 65, at 8. The court therefore declined to compel arbitration. Dkt. 65. Defendant appealed. Dkt. 66. The appellate court summarized the issues to be decided as follows:

> Did the parties form a final and complete oral contract in that initial phone call governing *all* their propane dealings over the next few years? Or did their agreement cover *only* Mr. Howard's propane tank rental and its initial fill, in this way perhaps leaving room for Ferrellgas's later-delivered, arbitration-clause-containing form contract to govern the parties' subsequent dealings, including the later propane purchases at issue in this case?
>
> Whether this case belongs in arbitration or litigation hinges on the answers to factual questions like these. It is possible that the parties reached an agreement requiring Ferrellgas to refill Mr. Howard's propane tank at market prices whenever it verged on empty, without a single mention of Ferrellgas's forthcoming written terms. If that's the case, then under Kansas law (which the district court applied here) Ferrellgas's arbitration clause could modify the parties' preexisting oral agreement only with Mr. Howard's express consent, something he contends he never gave. But it also remains possible that the parties agreed only to an initial fill during that phone call. And if *that's* the case, then under Kansas law Ferrellgas's arbitration clause and other written terms may well govern the parties' later dealings because they amounted to an offer to provide future service that Mr. Howard accepted when he chose to keep the propane Ferrellgas went on to deliver.

*Howard v. Ferrellgas Partners, L.P.,* 748 F.3d 975, 979 (10th Cir. 2014) (emphasis in original). The appellate court therefore remanded the case to this court to conduct a summary trial as to the issue of arbitration, pursuant to § 4 of the FAA. *Id.* at 984.

This court conducted a summary bench trial on November 12, 2014. Dkt. 127. At the conclusion of the parties' presentation of evidence the court instructed both parties to submit written closing statements. *See* Dkts. 135, 136.

## II.    Discussion

### A.    Choice of Law

As a preliminary matter, this case raises choice of law issues.  When deciding state law claims under diversity jurisdiction, as is the case here, a federal district court applies the choice of law rules of the state in which it sits.  *Koch v. Koch Indus.*, 2 F. Supp. 3d 1416, 1420 (D. Kan. 1998) (internal citations omitted).   Kansas courts generally apply the First Restatement of Conflicts of Law to choice of law issues.  *See Enutroff, LLC v. Epic Emergent Energy, Inc.*, 2015 U.S. Dist. LEXIS 11666, at *26 n.74 (D. Kan. Feb. 2, 2015) (citing *ARY Jewelers, LLC v. Krigel*, 277 Kan. 464, 481, 85 P.3d 1151, 1161-62 (2004)).   For purposes of contract claims, Kansas follows the rule of *lex loci contractus*, i.e., the law of the state where the contract is made governs.  *In re K.M.H.*, 285 Kan. 53, 60, 169 P.3d 1025, 1032 (Kan. 2007) (citing *ARY Jewelers*, 277 Kan. at 481).

Plaintiff placed the August 21, 2008, phone call to defendant from his home in California.  The customer service representative who answered the call did so from Washington. Therefore, under the doctrine of *lex loci contractus*, either California or Washington law could potentially govern the formation and scope of an oral contract between the parties.  The parties seem to agree that the last act to form the oral contract occurred in Washington, when defendant accepted plaintiff's offer to purchase propane.  The court agrees and finds that Washington state law governs the formation and scope of any dispute stemming from that telephone call.

However, "if the law of Kansas is not in conflict with any of the other jurisdictions connected to the suit, then there is no injury in applying the law of Kansas."  *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 535, P.3d 364, 372 (Kan. 2002) (quoting *Shutts v. Phillips Petroleum Co.*, 240 Kan. 764, 767, 732 P.2d 1286 (Kan. 1987)).  "In other words, if the outcome

of this dispute would be the same under the law of [another state] as under the laws of Kansas, the case presents a 'false conflict.'" *Id.* "Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue." *Id.* (quoting *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994)). Here, it has been established, and the parties agree, that the court's findings would be the same whether it followed Kansas, Washington, or California law.[3] Therefore, the court shall apply Kansas law *except* in the event that Kansas law and Washington law somehow differ.

**B.     Scope of the Oral Contract**

The first step in determining whether the parties must arbitrate or litigate their substantive claims is to determine the scope of the Oral Contract.

Under Kansas law, "[i]n an action based on contract, the plaintiff bears the burden of proving the existence of the contract alleged in the petition." *Unified Sch. Dist. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542, 546 (Kan. 2012) (citing *Steele v. Harrison*, 220 Kan. 422, 428, 552 P.2d 957 (1976)); *see also Steel Benders, Inc. v. H.R. Braner Eng'g, Inc.*, 1988 U.S. Dist. LEXIS 711, at *7 (D. Kan. Jan. 27, 1988). "The terms of an oral contract and the consent of the parties may be proven by the parties' acts and by the attending circumstances,

---

[3] Kansas, Washington, and California have each adopted the Uniform Commercial Code. *See* K.S.A. § 84-1-101, *et seq.*; Rev. Code Wash. § 62A.1-101, *et seq.*; Cal U Com Code§ 1101, *et seq.* Each state has adopted the objective manifestation test for contract formation. *See Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1002 (10th Cir. 2001) (The formation of a contract is determined "on objective, observable manifestations of intent to contract," not the purely subjective intent of the parties); *Keystone Land & Dev. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) ("Washington follows the objective manifestation test for contracts"); *Am. Emp'rs Grp., Inc. v. Emp't Dev. Dept.*, 154 Cal. App. 4th 836, 847 (Cal. Ct. App. 2007) ("Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings"). All three states also require that a party be given notice of any terms in a contract formed by conduct. *See Spam Arrest, LLC v. Replacements, Ltd.*, 2013 U.S. Dist. LEXIS 124820, at *27-28 (W. D. Wash. Aug. 29, 2013); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract."). *See also Olney v. Job.Com, Inc.*, 2014 U.S. Dist. LEXIS 131276, at *13-14 (E.D. Cal. Sept. 16, 2014).

as well as by the words that the parties employed." *Unified Sch. Dist. No. 446*, 295 Kan. at 282 (citing *Quaney v. Tobyne*, 236 Kan. 201, Syl. ¶ 3, 689 P.2d 844 (1984)). "Three elements create a contract: offer, acceptance, and consideration. Additionally, in order for parties to form a binding contract, the offer and acceptance must manifest a mutual assent or a 'meeting of the minds' on all the essential terms of the contract." *Steel Benders*, 1988 U.S. Dist. LEXIS 711, at *7-8 (citing *Steele*, 220 Kan. at 428, 552 P.2d at 962). "This 'meeting of the minds' requirement is proved when the evidence shows 'with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract.'" *Id*. at *8 (quoting *Steele*, 220 Kan. at 428, 552 P.2d at 962). "This standard relies on 'objective, observable manifestations of intent to contract,' rather than the purely subjective intent of the parties." *Republic Bank, Inc. v. West Penn Allegheny Health Sys.*, 475 Fed. Appx. 692, 698 (10th Cir. Apr. 12, 2012) (quoting *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1002 (10th Cir. 2001)).

### 1. No meeting of the minds

There is no dispute that plaintiff called defendant on August 21, 2008, and made a verbal offer to purchase propane. Or that defendant verbally accepted plaintiff's offer on that same date. Or that the parties orally agreed that plaintiff would lease defendant's propane tank and defendant would come out and initially fill that tank. Plaintiff would have this court believe that all of these definitive agreements somehow translate into the parties being bound, in perpetuity, not only for defendant's sale of propane to plaintiff but also by the "terms" discussed during that August 21, 2008, phone call.

This begs the question, then: what exactly *were* the terms discussed during that August 21st phone call? Unfortunately for plaintiff, he cannot remember. In his deposition, plaintiff stated as follows:

Q:     So my question is if you're claiming there's a contract between you and Ferrellgas that has been breached, I'd like to know what promises that you're contending Ferrellgas made to you.

A:     Well, that's a good question.  They promised to set a tank.  They promised me a tank rental rate, whatever that was.  They promised to install whatever appliances I had, whatever those were, I'd have to think about that to be sure, for a specified price.  They promised me an initial fill price, and they promised to deliver propane, and they promised that subsequent fills would be at the prevailing market price, whatever that happened to be.

Dkt. 60-2, at 14-15. However, in that same deposition, plaintiff also testified that he had no recollection of what occurred during that phone call:

Q:     Did you – who brought up the idea of the initial fill price?

A:     I don't remember.

Q:     And you don't remember whether or not you brought up the idea of the cost of refilling?

A:     I don't remember.

Q:     What about tank rate, who brought that up?

A:     I don't remember.

. . .

Q:     Okay.   And I know that you've already mentioned that you don't remember the exact words of that telephone call, but can you tell me what you do remember in terms of the – the exact words you can remember.

A:     I don't remember any of the exact words.

. . .

Q:     Okay.  So you don't remember any of the exact words that you spoke on that call, and you – and you don't remember any of the exact words that the customer service person spoke on that call?

A:     No.

Dkt. 60-2, at 5.

Similarly, during his trial testimony, plaintiff testified as follows:

Q:    Okay.  Now, this – as I understand it, I think from your testimony, you're saying there was an initial call with Ferrellgas and then you called back shortly thereafter to confirm service, tell them you wanted the service, is that right?

A:    Yes.

Q:    Okay.  And your contention is that at the end of those two calls you had an oral agreement with Ferrellgas for propane service, correct?

A:    Yes.

Q:    Back again when we deposed you, October 4 of 2012, you had no memory of the identity of the person you spoke with in these calls, correct?

A:    Correct.

Q:    You don't remember whether they were male or female, correct?

A:    I never remember speaking to a male but to be honest, I don't remember who I spoke to, that's correct.

Q:    Don't know the person's name, certainly?

A:    No.

Q:    But you did initiate the – the call with them?

A:    Yes.

Q:    And I think you just testified here today you don't remember the exact words used in any of those calls, or I think as you said verbiage?

A:    Correct.

Tr. 213:19-214:20.

Based on plaintiff's *own* testimony, what defendant promised plaintiff is, at best, unclear, and, at worst, only what the parties have conceded: the tank rental price, the tank set, and the initial fill.

In an attempt to bolster his argument, plaintiff cites defendant's training "scripts" that he alleges were in use in 2008. These scripts, according to plaintiff, provided defendant's customer service representatives with a step-by-step intake process for handling new customer calls. Dkt. 135, at 11. Although defendant's representatives testified that these scripts were indeed in use in 2008 and were also used to assist customer service representatives, there is *no* indication that the script was used during plaintiff's August 21, 2008, telephone call. Even if it was, there is nothing in the training document that provides proof that plaintiff entered into a long-term contract with defendant at the time of the phone call.

The scripts are divided into several basic segments: greet, data collection, connection program review, promotions page review, added benefits, schedule a delivery, and close. Ex. 80, 81, 82.[4] Under the "connection program review" section, the representative is instructed to inform the customer of defendant's program options; customers may choose from either the "keep full" plan, whereby defendant "estimates your propane usage and automatically delivers propane to you when our records indicate you need it," or the "will call" plan, whereby customers "monitor their own needs and schedule[] their own deliveries." Ex. 81.[5]

Plaintiff alleges that the script is "probative of the contents of the Telephone Call and an objective manifestation of Ferrellgas's intentions" to enter into an oral contract governing not only the First Fill, but also all subsequent fills. Dkt. 135, at 14 n.4. This court disagrees: plaintiff cannot definitively prove that the script was used during his telephone call. Even if he could, that still does not prove that defendant intended to, or in fact *did*, enter into an oral

---

[4] In some of the training documents, the steps are combined and/or use different language. For example, in Exhibits 80 and 81, the document refers to "promotions page review," while in Exhibit 82, the document refers to "other promotions." The content is similar, if not identical.

[5] In Exhibits 80 and 82, these plans are referred to as the "advantage plan" and the "value plan," respectively.

contract with plaintiff for all subsequent fills of propane.   The scripts encourage the representative to describe to the customer *both* the "keep full" and "will call" plans and actually states that defendant has "two great plans to choose from . . . ."  Trial Ex. 80, 81, 82.  In fact, defendant's notes from that August 21st phone call establish plaintiff as a "will call" customer:

> 8/21/08 tt Randy rqstd tank set as soon as possible.  Net30, *w/c*, 250gal tank set—
> first fill quoted 2.10/ppg and tank rent-free first yr 65.00/yr after.  Please call to
> set up tank set and fill @ 760-XXX-9859.  Adrienne 22831.

Trial Ex. 29 (emphasis added).  It was not until plaintiff's telephone call to defendant more than one year later, on October 26, 2009, complaining about the price per gallon, that there is *any* indication that plaintiff might have been a "keep full" customer.  Case notes from the October 26th phone call read in relevant part as follows:  "Cst upset was charged 3.22pg lst. Delivery, keep full net 30 . . . ."  Trial Ex. 29.  Furthermore, in the cover letter defendant mailed out in conjunction with the Master Agreement on September 25, 2008, plaintiff was described as a "will call" customer.  Trial Ex. 1.

The evidence also shows that neither party believed that they were obligated after the initial fill.  During his deposition testimony, Ray Galan, defendant's Division Sales Manager for the West Division, testified as follows:

> Q:  Now, I think you mentioned a new customer, a new customer like Mr.
> Howard, they don't have to order any propane after the initial fill, was that
> your testimony?
>
> A:  They do not.

Tr. 110:21-25.  Plaintiff argues that the evidence unequivocally shows that he *asked for* an ongoing supply of propane "because [he] had never had propane before" and he "didn't know what to expect and [] didn't want to run out."  Tr. 190:9-11.  However, plaintiff admitted, during

his deposition, that he never promised, during that initial phone call, to purchase any additional propane beyond that required for the First Fill:

> Q:    Did you promise them that you would purchase any quantity of propane after the initial fills?
>
> A:    No.
>
> Q:    Did you promise to buy any particular quantity of propane from Ferrellgas in the future?
>
> A:    No.
>
> Q:    Did Ferrellgas promise to sell you any particular quantity of propane in the future?
>
> A:    Actually, they did.  Their – they told me there'd be a small amount of propane in the tank when it was delivered, and they would come by later and fill it the rest of the way.
>
> Q:    And that's part of that initial fill; correct?
>
> A:    That is on the initial fill.  That's considered initial fill, yes.
>
> Q:    All right.  Did they make any promises to sell you any additional quantities of propane in the future after that?
>
> A:    No.
>
> Q:    Was there any minimum amount of propane you promised to buy from Ferrellgas?
>
> A:    Enough to fill the tank.
>
> Q:    The first time?
>
> A:    The first time.
>
> Q:    Did Ferrellgas promise to sell you propane forever?
>
> A:    No.

Tr. 15:1-16:7.  Likewise, at trial plaintiff testified as follows:

Q:      And during those first two initial phone calls, those two phone calls are what led to your tank set and your initial fill, correct?

A:      Correct.

Q:      And during those communications, you did not promise Ferrellgas that you would purchase any quantity of propane after that initial fill, did you?

A:      Specifically, no.

Q:      You did not promise at that time to buy any particular quantity of propane from Ferrellgas in the future, either, did you, sir?

A:      Aside from the first tank fill, no.

Q:      Okay.  In fact, the only amount of propane you promised to buy from Ferrellgas in those two discussions was enough to fill the tank in the initial fill, correct?

A:      Correct.

Q:      And Ferrellgas did not make any promises to sell you any additional quantities of propane in the future after the initial fills either, did they?

A:      Well, they did promise to keep my tank full.

. . .

Q:      Isn't it true that in fact the only promise Ferrellgas made to sell you any additional quantity in the future was that they said there'd be some gas in the tank at first and they would fill it up later?  And that's the promise they made to you in those first two phone calls about giving you – delivering to you future gas, isn't that true?

A:      Well, that, plus keeping my tank full but that assumes that I use gas.

. . .

Q:      And it's also true that Ferrellgas did not promise that they were going to continue to sell propane to you forever, correct?

A:      Forever?  No, they did not say forever.

Tr. 214:21-217:4.

16

Plaintiff also repeatedly makes the argument that the long-term arrangement between the parties is implied by plaintiff's agreement to enter into a *two-year* rental agreement for the propane tank.  However, the evidence is silent as to the *actual* duration of plaintiff's tank rental, aside from plaintiff's proffered belief.  In the notes connected to the August 21, 2008, telephone call, Williams simply indicated that "tank rent-free first yr 65.00/yr after."  Trial Ex. 29.  There is no reference to the specific duration of plaintiff's contract.   All the evidence shows is that plaintiff agreed to pay $65.00 per year after the first year for each year that he kept the propane tank on his property.

Plaintiff also cites the minimum volume requirement contained in the Master Agreement as evidence that the Oral Contract governed more than just the First Fill.  It is telling that plaintiff's only proof that a minimum volume requirement even exists is contained in the Master Agreement, the very document that he is arguing does not apply to the parties' relationship.  Plaintiff cannot have it both ways: he cannot argue that he is not bound by the terms of the Master Agreement on one hand while simultaneously arguing the defendant had certain policies that were *only* contained within the Master Agreement on the other.

There is, indeed, a minimum volume requirement contained within the Master Agreement:

> If you lease your Tank from us, you agree to purchase from us a volume of Propane at least equal to two times the water capacity of your Tank each 12-month period following your first delivery (the "Minimum Volume Requirement"), unless you have reached a different arrangement with us.  If you fail to purchase your Minimum Volume Requirement, we may, at our option, either terminate this Agreement and cease delivery of Propane to you, adjust the price of the Propane we deliver to you to include a surcharge for low volume, charge you a low usage fee, and/or increase your tank rent to reflect your low usage.

Trial Ex. 3.  However, the evidence establishes that this Minimum Volume Requirement does not create an *ongoing* obligation to purchase propane.  It simply means that defendant can charge a fee to the low volume customer.  Galan confirmed this assessment in his trial testimony:

> Q:     So there is a minimum volume requirement, isn't there, Mr. Galan?
>
> A:     There is a minimum volume requirement, yes.
>
> Q:     So you do – you are obligated to purchase propane –
>
> A:     You're not obligated.
>
> Q:     This says if you lease your tank from us you agree to purchase – you agree to purchase from us a volume of propane at least equal to two times the water capacity of your tank.  That is at least one complete refill, isn't it?
>
> A:     We – we have the option to charge a minimum, low, or no use fee if somebody decides not to purchase a product from us and, again, it's still their – their option to purchase product.
>
> . . . .
>
> Q:     Okay, so there is a minimum volume – there is a minimum volume requirement to purchase propane, isn't there?
>
> A:     Again, there's a minimum requirement that we deem necessary not to charge a low or no use fee, otherwise we need a return on our investment. If we're not getting a return on the investment, why have the tank sitting out?

Tr. 140:11-141:25.

Based on the evidence presented, or rather, the lack thereof, at least on the part of plaintiff, this court concludes that it was merely plaintiff's subjective, internalized understanding that he reached a complete oral contract with defendant that governed not only the First Fill but also all subsequent fills.  As noted above, "in order for parties to form a binding contract, the offer and acceptance must manifest a mutual assent or a 'meeting of the minds' on all the essential terms of the contract."  *Steel Benders*, 1988 U.S. Dist. LEXIS 711, at *7-8 (citing

*Steele*, 220 Kan. at 428, 522 P.2d at 962).  This meeting of the minds requires "reasonable definiteness" that the parties agreed upon the terms of the contract that can be proven through "objective, observable manifestations of intent to contract, *rather than the purely subjective intent of the parties*."  *Republic Bank*, 475 Fed. Appx. at 698 (internal citations omitted) (emphasis added).  Here, plaintiff has only his subjective intent to enter into an Oral Contract governing both the First Fill and all subsequent fills which simply does not satisfy plaintiff's burden to prove the alleged expanded scope of the Oral Contract.  The court therefore finds that the Oral Contract governs only the tank set and the First Fill.

The court must now determine if the parties are bound by the Master Agreement.

**C.      Scope of the Master Agreement**

Just as plaintiff had the burden of proving the existence and scope of the Oral Contract, defendant has the burden of proving the existence and scope of the Master Agreement, and, more specifically whether the parties are bound by the arbitration provision.

Although the interpretation of contracts, including arbitration agreements, is generally a matter of state law, the FAA "imposes certain rules beyond those normally found in state contract law."  *G.W. Van Keppel Co. v. Dobbs Imps., LLC*, 2014 U.S. Dist. LEXIS 146913, at *3-4 (D. Kan. Oct. 15, 2014) (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010)).  The FAA applies to written arbitration agreements in any contract "evidencing a transaction involving commerce."  *Id.* at *4 (quoting 9 U.S.C. § 2).  "Congress designed the FAA to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and, by enacting the FAA, created a liberal federal policy favoring arbitration agreements."  *Id.* (internal citations omitted).  Under the FAA, a court should compel arbitration if it finds that: "(1) a valid arbitration agreement exists between the parties, and (2) the dispute before it falls within the

scope of the agreement." *Id.* (citing 9 U.S.C. §§ 2, 3). "If a contract contains an arbitration provision, there is a presumption of arbitrability." *Brookins v. Superior Mgmt. Group*, 2013 U.S. Dist. LEXIS 154629, at *4 (D. Kan. Oct. 29, 2013) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)); *see also Gratzer v. Yellow Corp.*, 316 F. Supp. 2d 1099, 1103 (D. Kan. 2004).

"Whether the parties agreed to arbitrate a dispute is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Brookins*, 2013 U.S. Dist. LEXIS 154629, at *4 (internal citations omitted). "Whether there is an enforceable arbitration agreement is a matter of state contract law to be decided by the court." *Id.* (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 777 (10th Cir. 2010). "A defendant seeking to compel arbitration has the initial burden to show enough evidence of an enforceable agreement to arbitrate. If the defendant meets this burden, the plaintiff must show a genuine issue of material fact as to the validity of the agreement." *Brookins*, 2013 U.S. Dist. LEXIS 154629, at *4 (citing *SmartText Corp. v. Interland, Inc.*, 296 F. Supp. 2d 1257, 1263 (D. Kan. 2003)). Any doubt should be resolved in favor of arbitration. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *Newmont USA Ltd. v. Ins. Co. of North America*, 615 F.3d 1268, 1275 (10th Cir. 2010).

However, despite its liberal policy, the FAA does not require a party "to submit to arbitration any dispute which he has not agreed so to submit." *G.W. Van Keppel*, 2014 U.S. Dist. LEXIS 146913, at *4 (quoting *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003)). "Instead, [the FAA] requires that courts enforce 'agreements to arbitrate, like other contracts, in accordance with their terms.'" *Id.* (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Standford Junior Univ.*, 489 U.S. 468, 478 (1989)). Therefore, "if a generally applicable state

contract defense invalidates an arbitration agreement, or if grounds exist at law or equity that would call for the revocation of any contract," a court must not compel arbitration.  *Id.* (citing *Volt Info. Scis., Inc.*, 489 U.S. at 478); *see also Perry v. Thomas*, 482 U.S. 483, 489 (1987).

> Enforcing the agreement according to its terms 'is fully consistent with the goals of the FAA, even if the result is that the arbitration is stayed where the Act would otherwise permit it to go forward' because by rigorously enforcing the agreement according to its terms, courts give 'effect to the contractual rights and expectations of the parties, without doing violence to the policies behind the FAA.'

*G.W. Van Keppel Co.*, 2014 U.S. Dist. 146913, at *5 (quoting *Volt Info. Scis., Inc.*, 489 U.S. at 478).

### 1.      Application of the Uniform Commercial Code

Since this case's inception, plaintiff has argued that, because the relationship between the parties involved a sale of goods for more than $500, the Uniform Commercial Code ("UCC") applies.  Defendant has never contested the use of the UCC.

The bulk (if not all) of plaintiff's argument concerning the UCC has, up until this point, focused on § 2-207, which restricts modifications to existing contracts governed by the UCC.[6] As discussed thoroughly below, the court finds that § 2-207 does *not* apply, based on the interpretation of the Oral Contract and the Master Agreement.

However, in its Reply to defendant's Post-Trial Brief, plaintiff asserts, *for the first time*, an *enforceability* argument, namely that the Master Agreement is invalid due to the provisions of § 2-201.  This section governs the formal requirements of a contract under the UCC and deals also with the Statue of Frauds.  It states, in relevant part:

---

[6] UCC § 2-207 reads, in relevant part, as follows: "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and *signed* by the party against whom enforcement is sought or by his authorized agent or broker.  A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

U.C.C. § 2-201(1) (emphasis added).  According to plaintiff, at least in his most recent argument, defendant must establish that the Master Agreement was *signed* in accordance with the statute of frauds.  Dkt. 140, at 14.  Plaintiff argues that defendant offers no evidence that the Master Agreement was signed by plaintiff or that the statute of frauds is somehow otherwise inapplicable.  As a result, plaintiff cannot be bound by the Master Agreement and, more specifically, the arbitration provision.  Dkt. 140, at 14.

What plaintiff seemingly fails to realize, however, is that his statute of frauds argument is a defense to the Master Agreement's *enforceability*, not its mere existence.  And long-standing case law dictates that arbitration provisions embedded within contracts otherwise governed by the UCC are not subject to a statute of frauds analysis.

> Arbitration provisions and agreements are governed by the FAA.  Under the Act,
>
> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The FAA does not require arbitration agreements to be signed; rather, as is indicated in § 2, they need only to be in writing.  *See Bellman v. i3Carbon, LLC*, 563 Fed. Appx. 608, 614 (10th Cir. 2014) (holding that "[w]hile the [FAA] requires a writing evidencing an agreement to arbitrate disputes, it is well-established that the FAA does not require signatures of

the parties to be enforceable."); *see also Rangel v. Hallmark Cards, Inc.*, 2010 U.S. Dist. LEXIS 19755, at *15 (D. Kan. Mar. 4, 2010) (quoting *Med. Dev. Corp. v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973) ("it is not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause.  All that is required is that the arbitration provision be in writing")); *Perkins v. Rent-A-Center, Inc.*, 2004 U.S. Dist. LEXIS 8203, at *8-9 (D. Kan. May 5, 2004) (". . . the Federal Arbitration Act does not require arbitration agreements to be signed.  It is immaterial whether a proper representative of Defendant signed the agreements.").

In an effort to somehow get around the fact that arbitration agreements need not be signed, plaintiff seemingly suggests that, because the Master Agreement concerns the sale of goods, and is therefore governed by the UCC, signature is required, as per the statute of frauds. However, plaintiff fails to take notice of decades of well-established Supreme Court precedent that states otherwise.  Nearly fifty years ago, the Supreme Court declared that arbitration clauses are, as a matter of federal substantive law, *separate* from the contracts in which they are embedded.  In *Prima Paint Corporation v. Flood & Conklin Manufacturing Company*, 388 U.S. 395 (1967), the Court held that if the claim "goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it.  But the statutory language *does not permit* the federal court to consider [challenges to the contract] generally . . . a federal court may consider *only* issues relating to the making and performance of the agreement to arbitrate."  388 U.S. at 403-04 (emphasis added).

The reason for this can be summed up by Justice Scalia's reasoning in *Buckeye Check Cashing, Inc. v. Cardegna*:

> It is true, as respondents assert, that the *Prima Paint* rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be

> void.  But it is equally true that respondents' approach permits a court to deny
> effect to an arbitration provision in a contract that the court later finds to be
> perfectly enforceable.  *Prima Paint* resolved this conundrum – and resolved it in
> favor of the *separate* enforceability of arbitration provisions.  We reaffirm today
> that, regardless of whether the challenge is brought in federal or state court, a
> challenge to the validity of the contract as a whole, and not specifically to the
> arbitration clause, must go to the arbitrator.

546 U.S. 440, 448-49 (2006) (emphasis added).  In other words, in terms applicable to the case at hand, this court is permitted to consider issues relating to the parties' making of the agreement to arbitrate.  In fact, that is the *sole* purpose of this order.  Any challenges to the enforceability of the Master Agreement must be decided by the arbitrator.

The question then becomes whether challenges based on the statute of frauds deal with the making of the agreement to arbitrate.  Courts have soundly held that the statute of frauds is a challenge to the enforceability of an otherwise formed agreement.  *See, e.g., Clements v. DIRECTV, LLC*, 2014 U.S. Dist. LEXIS 40055, at *16 (W.D. Ark. Mar. 26, 2014) ("Plaintiffs' [statute of frauds] arguments challenge the Customer Agreement as a whole.  Accordingly, these arguments are for the arbitrator to consider, not this Court."); *Nat'l City Golf Fin. v. Higher Ground Country Club Mgmt.*, 641 F. Supp. 2d 196, 207 (S.D.N.Y. 2009) ("Failure to satisfy the statute of frauds does not mean that no contract exists; that statute does not deprive the agreement of all effect, and it is still appropriate to refer to the agreement as a contract.  Rather, a failure to satisfy the statute as to a party merely precludes enforcement of the agreement against that party.").  *See also D-J Eng'g Inc. v. UBS Fin. Servs.*, 2012 U.S. Dist. LEXIS 6678, at *12 (D. Kan. Jan. 20, 2012) (holding that deciding whether a contract is illusory is an issue for the arbitrator, not the court).

Here, plaintiff's own pleadings acknowledge that his statute of frauds argument concerns the *enforceability* of the Master Agreement as a whole.  He states, "[t]he Master Agreement

placed in evidence by Defendants was not signed in any way by Mr. Howard and there is no suggestion that Mr. However *ever* signed the Master Agreement.   Accordingly, the Master Agreement, and the arbitration provision, is unenforceable against Mr. Howard." Dkt. 140, at 15 (emphasis in original).  Whether the balance of the Master Agreement, aside from the arbitration provision, is enforceable against plaintiff is an interesting question; however, it is not one for this court to now decide.  Therefore, the court finds that plaintiff's statute of frauds argument, *as it pertains to the arbitration provision*, is without merit.

As an aside, the court cannot help but note the late date at which plaintiff first made this argument.  The general rule in the Tenth Circuit "is that a party waives issues and arguments raised for the first time in a reply brief."  *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009)). This case has been in litigation for nearly *five* years. Although plaintiff may have had any number of reasons for delaying this argument, the fact of the matter remains: it simply comes too late.[7]

### 2.    Enforcement of the Master Agreement

Plaintiff attacks the validity of the Master Agreement (with its arbitration provision) on the ground that it could only be seen as a proposal to *modify* the Oral Contract. Under UCC § 2-207, such a modification requires plaintiff's *express* consent, which plaintiff alleges he never gave.  Dkt. 135, at 25-27.  Based on its previous ruling as to the scope of the Oral Contract, the court disagrees.

---

[7] On February 25, 2015, this Court asked defendant to respond to plaintiff's U.C.C. § 2-201 argument. Defendant provided a very targeted response to this inquiry on March 6, 2015.  Dkt. 143.  On March 10, 2015, plaintiff requested leave to submit even more briefing on the issues in this case.  Dkt. 144.  Because of the extensive briefing in this case, the court does not find it necessary to entertain further pleadings.

Because plaintiff failed to establish that the Oral Contract governed all subsequent fills of propane beyond the First Fill, defendant's Master Agreement, which was admittedly not sent to plaintiff until after plaintiff received the First Fill, must be regarded as a new offer.  This placed the ball in plaintiff's court to then accept or decline the new offer.  Under the terms of the Master Agreement, plaintiff was deemed to have accepted the offer if he: (1) requested or accepted delivery of propane, service, or equipment from defendant; (2) paid for delivery of propane, service, or equipment from defendant; or (3) permitted the propane or equipment obtained from defendant to remain on his property for more than thirty (30) days after his receipt of the Master Agreement.  Trial Ex. 3, at 1.

The evidence on this issue is very clear: plaintiff did indeed request and accept delivery of propane, services, and equipment from defendant after defendant mailed the Master Agreement.  Defendant contends that it mailed the Agreement on September 24, 2008.  Plaintiff subsequently received *eight* deliveries of propane over the next two years.  Trial Ex. 34.  By default, then, it is clear that plaintiff allowed the propane and equipment to remain on his property long after the thirty-day window of termination had expired.  Moreover, the evidence shows that plaintiff paid for each and every one of these deliveries of propane.  Therefore, by his own actions, plaintiff accepted the terms of the Master Agreement and was therefore bound by those terms for all subsequent fills.

Plaintiff attempts to show a genuine issue of material fact as to the validity of the Master Agreement by alleging that he never *received* the Agreement in September 2008 and that, in fact, he only received the Agreement after requesting it upon the suggestion of his attorneys in January 2010.  However, plaintiff's physical receipt of the Master Agreement is not altogether necessary.

In general,

[t]he rule is that when mail is properly addressed, stamped, and deposited in the mail system, there is a strong, although rebuttable, presumption that it was received by the party to whom it was sent. Proper mailing, however, must be established before the presumption is triggered. Generally, proof of custom is sufficient to carry the burden of proper mailing. Proof of customary and usual computer procedures is sufficient to show adherence to usual and customary procedure which is sufficient to carry the burden of proper mailing. The mailing employee need not testify.

*Fed. Kemper Life Assurance Co. v. Ellis*, 1992 U.S. Dist. LEXIS 15449, at *18-19 (D. Kan. Sept. 21, 1992) (internal citations omitted). The burden is therefore on defendant to show that proper mailing occurred.

To establish proper mailing, defendant relies upon the testimony of its Marketing Manager, Brian Mater. At the time in question, Mater was a marketing analyst, whose responsibilities included providing support for the marketing team with new customer mailings. Tr. 48:19-20. Mater testified that all names and addresses of new customers (as well as things such their ownership, service level, and ID numbers) are exported from defendant's internal customer service database, PeopleSoft CRM, into an Excel spreadsheet. Tr. 57:13-16. This export occurs once per week. Tr. 58:16-18. These spreadsheets are then sent to defendant's "mail house," an external service provider that runs the spreadsheets through a CASS certification process. Tr. 60:11-61:1. Mater explained that the CASS certification process involves software provided by the United States Postal Service that adds a customer's zip code "plus four" and generally identifies records as being mailable or not. Tr. 60:18-23. The mail house then runs defendant's new customer packets through the presort process, meters the mail, and prepares all defendant's mail for mailing. Tr. 60:24-61:1. Once it is done with its process, the mail house provides defendant with a list of the CASS certified names and addresses. Tr. 65:7-10.

27

With regard to plaintiff's new customer packet mailing, Mater testified that plaintiff's name was on a list comprised of 1,961 names, dated August 21, 2008.  Tr. 63:19-64:6.   Mater explained that the list included all new customers from August 15 through 21, 2008.  Tr. 72:22-73:6.  When asked if he could tell whether plaintiff's name went through the CASS certification process, Mater indicated that it had because the spreadsheet returned from the mail house contained plaintiff's address with his "zip plus four."  Tr. 66:3-4.  In fact, plaintiff's zip code was listed as XXXXX-0276.  Trial Ex. 50, at 62; Tr. 66:5-7.  The list that Mater sent *to* the mail house did not contain plaintiff's zip "plus four."  Trial Ex. 5; Tr. 66:15-16.

On August 26, 2008, Mater requested that the mail house send addressed new customer packets (that contained the Master Agreement) to 1,961 customers.  Records show that, on September 26, 2008, the mail house mailed 1,960 new customer packets in internal sequence number 9846.[8]  The mail house provided defendant with a confirmation of this mailing in the form of a Postage Statement and an affidavit. Trial Ex. 7, 8.

Defendant was also able to establish that there was no record of plaintiff's new customer packet being returned as undeliverable.  Mater testified that, in the regular course of business, whenever defendant received returned mail, a specifically designated customer service team, located in Liberty, Missouri, would create a record within the company's internal PeopleSoft CRM database.  Tr. 84:21-85:5.  The database has no record of plaintiff's mail being returned.  Tr. 85:6-10.

---

[8] There was some testimony as to the discrepancy between the request of 1,961 customers and the actual mailing to 1,960 customers.  Mater testified that one of the addresses in batch 9846 was a Canadian address, for which the CASS system could not verify the address.  Tr. 82:23-83:5.

Based on Mater's testimony about defendant's regular business practice regarding the mailing of new customer packets, which include the Master Agreement, defendant has established proper mailing.  The burden then falls to plaintiff to rebut that presumption.

Plaintiff's *only* response to defendant's claim that it mailed the Master Agreement in September 2008 is that he did not recall receiving it and could not locate it in his files.  Tr. 197:25-198:3, 199:4-10, 206:24-207:13, 208:7-14; Dkt. 60-2, at 22-23, 24-25, 29, 33, 35-36. This simple denial of receipt is not enough to rebut the presumption that the Master Agreement was indeed mailed.  "When mail is properly addressed, stamped and deposited in the mail system, there is a presumption it was received by the party to whom it was sent."  *Valley Chip Sales v. New Arts Tater Chip Co.*, 1996 U.S. Dist. LEXIS 18232 (D. Kan. Oct. 10, 1996) (citing *In Re Am. Props., Inc.*, 30 Bankr. 235, 237 (D. Kan. 1983)).  Once proper mailing is proved, as is the case here, "denial of receipt does not create an issue for the jury as to whether" the Master Agreement was mailed.  *Fed. Kemper Life Assurance Co.*, 28 F.3d at 1040; *see also Valley Chip Sales*, 1996 U.S. Dist. LEXIS 18232, at *10 ("When mail is properly addressed, stamped, and deposited in the mail system, there is a presumption it was received by the party to whom it was sent.  Proper mailing, however, must be proved before the presumption is activated.  Denial of receipt does not, as a matter of law, rebut the presumption, but rather creates a question of fact.").

Moreover, plaintiff admitted, both during his deposition and at trial, that it was *possible* that he received the Master Agreement in September or October 2008.  During his deposition, plaintiff stated as follows:

> Q:  In all – Ferrellgas' contention in the lawsuit . . . is that it sent you a . . . welcome packet that included a master agreement, as well as some safety material on September 26, 2008.  Did you receive those?

A:      I have no recollection of such a thing.

Q:      So do you know one way or the other whether you received them?

A:      I don't remember seeing that.

Q:      *But are you claiming that you for sure didn't receive it?*

A:      *No.  I'm claiming that I have no recollection of receiving it.*

. . .

Q:      You're not denying it's possible you received this, are you?

 . . .

A:      *It's possible, but I don't remember receiving it.*

Dkt. 60-2, at 23-24, 29 (emphasis added).  Likewise, at trial, plaintiff testified that it was possible

that he had received the Master Agreement:

Q:      You could not rule out the possibility at that time that you had received the Master Agreement in September or October of 2008, correct?

A:      I believe what I said was anything's possible.

Q:      I believe you said it's possible that you received it but you didn't recall it, is that correct?

A:      Words to that effect.

Q:      All right.  So as I understand your position today you're not claiming for sure that you did not receive it, you're just claiming that you have no recollection of receiving it, correct?

A:      I have no recollection of receiving it and given that I had never heard the term "Master Agreement" until I started talking to lawyers, I think if I had seen it before I would remember that term.

. . .

Q:      When your deposition was taken October 4 of 2012 the only fact that you were able to identify for us, which you said would support your contention

> that you did not receive the Master Agreement in later September or early
> October of 2008 was that you didn't remember receiving it, correct?

A:   Well, I can't prove a negative, the only thing I have to go on is my
     memory, so yes.

Tr. 206:24-207:13, 208:7-14.  When asked, plaintiff admitted that the address listed on the welcome packet mailed on September 24, 2008, *was* his correct mailing address and that he in fact received other mailings from defendant at this address.  Tr. 209:6-15.  The court therefore finds that plaintiff's mere denial of receipt of the Master Agreement in September or October 2008 is not sufficient to rebut the presumption that defendant did indeed mail the Agreement.

Plaintiff therefore had two choices: either opt-out of the Master Agreement by returning the equipment and terminating service or agree to the terms of the Master Agreement, including the arbitration provision, by keeping the equipment and continuing to accept deliveries of propane.  The evidence clearly establishes that plaintiff chose the latter option.  Plaintiff continued to receive deliveries of propane for more than two years after the September 24, 2008, mailing.  Trial Ex. 34; Tr. 209:16-22, 201:25-202:6.  Even *more* telling is that plaintiff received at least two deliveries of propane after January 2010, when he admitted that he *definitely* received the Master Agreement.  Trial Ex. 34, Tr. 135:10-25, 212:5-24.

Plaintiff attempts to make some argument, drawing on case law from other circuits, that even if he is deemed to have received the Master Agreement in 2008, that "does not without more establish that he should know that the terms disclosed in the Master Agreement relate to a service in which he had previously enrolled and that a failure affirmatively to opt out of the service amounts to assent to those terms."  Dkt. 135, at 32.  In so arguing, plaintiff relies upon several decisions of the Second and Ninth Circuits that deal with browsewrap and shrinkwrap agreements.  What plaintiff draws from these cases is the premise that because defendant's

scripts state that there is no paperwork to fill out and the customer service representative allegedly made no reference to the Master Agreement, plaintiff could not possibly have been on notice that the Master Agreement would somehow govern all subsequent fills.

There are several problems with this argument. First, as established above, there is no proof that defendant's customer service representative used the scripts during plaintiff's August 21, 2008, telephone call. Second, plaintiff himself has testified repeatedly that he cannot remember exactly *what* was said during that telephone call. It is entirely possible that Williams *did* mention that written terms and conditions were forthcoming. Third, the court finds it interesting that at no time has plaintiff complained about the imposition of other terms, such as Hazmat fees and the like, that were allegedly never mentioned during the telephone call yet were later imposed. This certainly suggests that plaintiff had no difficulty accepting terms allegedly imposed after the Oral Contract. Finally, plaintiff admitted that, *even after receiving* the Master Agreement in January 2010, he did not actually read it until the day before his deposition in October 2012. This is a failure of plaintiff, not defendant.

### 3.      Notice and Opt-Out Provisions

In response to defendant's argument, plaintiff claims that his conduct could only amount to assent to the Master Agreement if he had *notice* of the existence of the terms and conditions and the consequences of his continued acceptance of propane, and a *meaningful opportunity* to opt out of the Master Agreement. Dkt. 135, at 31-34. With regard to notice, plaintiff relies on cases involving email notifications of additional terms and conditions as well as "shrinkwrap" and "browsewrap" agreements. According to plaintiff, it is defendant's "onus . . . to put users on notice of the terms to which they wish to bind consumers." Dkt. 135, at 34 (quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014)). This means that defendant could

have advised plaintiff, during that August 21st telephone call, that additional terms and conditions would be forthcoming or, in the alternative, included the Master Agreement with delivery and/or with plaintiff's initial bill.

Because there is virtually no Tenth Circuit law on point, plaintiff relies heavily on a Second Circuit case, *Schnabel v. Trilegiant Corporation*, 697 F.3d 110 (2d Cir. 2012), to support his claim.  In *Schnabel*, the plaintiff consumers alleged that they were automatically enrolled in the defendant's online monthly subscription service by being re-routed from a third-party webpage on which they made a purchase.   697 F.3d at 114.   The defendant's terms and conditions contained an arbitration provision.   *Id*. at 116.   Upon learning of the allegedly unknown automatic enrollment, the plaintiffs sought a return of the monthly fee charged by the defendant.   *Id*.  The plaintiffs filed suit and the district court, much like is the case here, was first required to determine whether the parties entered into a binding provision requiring them to arbitrate all issues.   Similar to the case at hand, the defendant argued that the plaintiffs assented to the arbitration provision by enrolling in the monthly subscription service, receiving the emailed terms, and not cancelling their membership during the free trial period.   *Id*. at 120.   The plaintiffs disagreed.   *Id*.

> In its analysis, the Second Circuit first noted that in these types of cases,
>
> where the purported assent is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue.  In other words, where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent.  Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry.

*Schnabel*, 697 F.3d at 116.  Based upon the facts of the case, the court held that an unsolicited email from an online consumer business did not put the plaintiffs on notice of the terms enclosed in that email.  *Id.* at 123.

While *Schnabel* and the case now before this court are similar in that the later-supplied written contracts both provided an arbitration clause, they are wholly inconsistent otherwise. *Schnabel* involved a case whereby the plaintiffs did not truly *know* that they were enrolling in the defendant's services – they were merely redirected to the defendant's website from websites that they intentionally visited and made purchases from.  Here, there is no dispute that plaintiff knew full well what he was purchasing and from whom he was purchasing it.  Defendant did not bury the arbitration provision in a random email; rather, it included it in a document specifically mailed to plaintiff's documented mailing address.  The plaintiffs in *Schnabel* were not even aware that they should be watching for further terms, emailed or otherwise, as they were not fully aware that they had entered a contract with the defendant.  That simply is not the case between the parties here.

If anything, this case is most similar to a very recent case from the Southern District of New York, *Valle v. ATM National, LLC*, 2015 U.S. Dist. LEXIS 11788 (S.D.N.Y. Jan. 30, 2015).  In that case, the plaintiff consumer opened a savings account at a particular bank which, at some point later, notified its customers that they could use the defendant's ATMs for free without being subject to ATM fees or surcharges.  2015 U.S. Dist. LEXIS 11788, at *3.  The bank subsequently issued a disclosure and agreement explaining that it would become the operative agreement between itself and its customers.  *Id.* at *4.  The amended agreement contained an arbitration provision and class action waiver.  *Id.*  The bank gave its customers the opportunity to reject the amended agreement by closing their account and withdrawing all funds

34

within sixty days of the notice. *Id*. at *5. It also specified that customers could opt out of the arbitration provision by mailing a signed rejection notice within forty-five days of receipt of the amended agreement. *Id*. The plaintiff took no affirmative action to reject either the agreement itself or the arbitration provision and continued to use her account. *Id*. She later alleged that, despite the defendant's assurances, she was charged an ATM fee. *Valle*, 2015 U.S. Dist. LEXIS 11788, at *3-4.

In determining whether the plaintiff was bound by the arbitration provision, the district court noted that, instead of burying its arbitration provision in an unexpected email, as was the case in *Schnabel*, the bank mailed the amended agreement to the address regularly used to communicate with the customer and highlighted the arbitration provision. *Id*. at *9. Likewise, here, defendant mailed the Master Agreement to the address regularly used to communicate with plaintiff and highlighted the arbitration provision, as well as plaintiff's opportunity to opt-out of the agreement. Trial Ex. 3, at 17-18. The court therefore finds that the Master Agreement provided plaintiff adequate notice.

With regard to the second requirement, that plaintiff have a "meaningful opportunity" to opt-out of the Master Agreement, plaintiff argues that nowhere does the Master Agreement provide that the consumer can opt-out after he requests, accepts, or pays for delivery of propane. Dkt. 135, at 35-36. By the terms of the Master Agreement, this is untrue.

In the very first paragraph of the Master Agreement, in bolded font, is the following disclaimer: "If you do not wish to be bound by this Agreement, please contact Ferrellgas within thirty (30) days after your receipt of this Agreement and terminate service." Trial Ex. 3. Plaintiff argues that the Master Agreement "includes a plethora of costs and fees imposed on a customer terminating service, including the cost of the propane in the tank (which could amount

to more than $1,000). Nowhere does the Master Agreement provide that the termination fees do not apply if you do not wish to be bound by this agreement and terminate service." Dkt. 135, at 35. As a result, in plaintiff's eyes, the opt-out provision was "so vague and ambiguous as to render it meaningless." Dkt. 135, at 36.[9]

The instructions seem clear: if you get this Master Agreement and do not like its terms, you may, within thirty days, terminate service with Ferrellgas; all you have to do is pick up the phone and call us. Perhaps the opt-out provision could have been *more* clear by including every eventuality that a consumer might have encountered between the time that he or she received the tank and the time that he or she received the Master Agreement, but the provision, as it stands, certainly is not unclear, vague, or ambiguous.[10] Plaintiff cannot now impose some type of ambiguity on a contract that is not ambiguous simply because *he* opted not to exercise his rights.

Therefore, the court finds that defendant gave plaintiff sufficient notice and opportunity to reject the Master Agreement, but plaintiff simply chose not to do so. This does not speak to the applicability of the Master Agreement; rather, it speaks only to plaintiff's inaction. This is bolstered by the fact that when plaintiff called and specifically requested a copy of the Master Agreement in 2010, he *still* chose not to opt-out. Instead, he ordered more propane on at least two, if not three, occasions. As such, plaintiff's failure to contact defendant and terminate service within thirty days constituted acceptance of the Master Agreement.

---

[9] Interestingly enough, as defendant points out, the obvious question in response to plaintiff's argument with regard to termination fees is where he came up with the idea that there *were* termination fees. Plaintiff has never alleged that such fees were mentioned in the August 2008 telephone call. Rather, plaintiff has only discussed termination fees with respect to the Master Agreement. But, if plaintiff truly believed that the Master Agreement does not govern his relationship with plaintiff, why would he believe that there are termination fees?

[10] Furthermore, this is much like the situation presented in *Valle*, where the amended agreement provided an express opt-out provision. 2015 U.S. Dist. LEXIS 11788, at *8. The district court there found that, unlike in *Schnabel*, where there *was* no opt-out provision, the amended agreement contained an opt-out provision that plaintiff simply declined to exercise. *Id*. at *9.

Consequently, and in sum, the court finds that plaintiff is bound by the Master Agreement and all of its terms, including the arbitration provision.  Plaintiff failed to establish that the parties agreed, during the August 21, 2008, telephone call that the Oral Contract would govern not only the propane tank set and First Fill but also all *subsequent* fills.  In contrast, defendant was able to carry its burden to show that it mailed plaintiff the Master Agreement which *does* govern all subsequent fills.  By plaintiff's continued acceptance of defendant's goods, services, and equipment, he has bound himself to the terms of the Master Agreement and therefore must arbitrate his claims against defendant.[11]

**IT IS THEREFORE ORDERED** this 16th day of March, 2015, that plaintiff's Motion to Compel Arbitration (Dkt. 37) is hereby granted.

s\J. Thomas Marten
J. Thomas Marten
Chief Judge

---

[11] During the course of litigation, the parties engaged in some debate about the use of the "rolling contract" theory and whether or not it would apply to the situation at hand.  The rolling contract theory, the idea that rather than being complete immediately, a contract for goods is formed when deferred terms are reviewed by the consumer buyer and accepted by some act, is, in the words of the Tenth Circuit "about as controversial an idea as exists today in the staid world of contract law."  *Howard v. Ferrellgas, et al.*, 748 F.3d 975, 982 (10th Cir. 2014).  Because the court finds that defendant carried its burden to show that it mailed the Master Agreement and, by his actions, plaintiff accepted the terms thereof, it finds it unnecessary to address the use of the rolling contract theory.